

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 12, 2023

**BY ECF**

The Honorable John P. Cronan
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:      <u>*United States v. James Kim (Byung Hoon Kim)*</u>,
                 No. 19 Cr. 392 (JPC)

      The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that James Kim has rendered in the investigation and prosecution of other persons. In light of these facts, and assuming that Kim continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines and 18 U.S.C. § 3553(e), that the Court sentence him in light of the factors set forth in Sections 5K1.1 and 3553(e).

    I.    Background

        a.   <u>Kim's Personal Background</u>

      Kim, 66, is a naturalized American citizen who was born and raised in South Korea. (Presentence Investigation Report ("PSR") ¶ 46). He obtained U.S. citizenship in or about 2012. (PSR ¶ 48). Before coming to the United States in 1990, Kim worked various jobs in Korea including as a driver, selling merchandise, and selling residential real estate. After moving to the United States in the late 1990's, he worked at a few gift shops before entering commercial real estate in or about 2000. Kim speaks some English, but benefits from the use of an interpreter.

      Kim has five siblings, all of whom are still living. (PSR ¶ 46). Both of his parents are now deceased. (*Id.*). Kim came from a supportive family, but when he was a child they struggled financially due to the conditions of the Korean War. (PSR ¶ 47). He left school when he was a sophomore in high school to assist his family by working. (PSR ¶ 59). While Kim struggled in school academically, he did not have any disciplinary history. (*Id.*). Kim served in a military branch in South Korea in the 1970s. (PSR ¶ 60).

      Kim married his wife, Kyung Mee Lee, in South Korea in 1990. (PSR ¶ 49). Kim and his wife have been separated since 2015, though they remain friendly. (*Id.*). Kim and his wife have two adult children with whom Kim maintains a close relationship. (*Id.*).

      [REDACTED]

    b. <u>Offense Conduct</u>

      In or around 2009, Kim, who was a close friend of Noah Bank CEO Edward Shin, began to act as a loan broker for Noah Bank on both SBA and commercial loans. At the time, Kim was self-employed as a real estate and loan broker, working mostly with the Korean-American community in New York and New Jersey. Between 2009 and 2012, Kim brokered numerous Noah Bank SBA-guaranteed loans frequently on behalf of companies acquiring small delis or food stores in the New York area. When Kim brokered a loan on behalf of such a company, he was typically compensated for his work by receiving a broker's fee, which consisted of a small percentage of the amount loaned. After getting into business with Noah Bank, Kim agreed with Shin that Shin would receive a portion of Kim's broker's fee in cash, as a bribe or kickback for Noah Bank providing the loan and continuing to do business with Kim. After Kim received his broker's fees for the transactions, typically by certified check from Noah Bank, Kim would deposit or cash the check, and provide the amount of cash requested by Shin to him at an in person meeting, usually at Kim's offices in New York, New York.

      After Shin began to receive a portion of KIM's broker's fees, Shin began to use KIM to receive bribes or kickbacks on loans originating from Noah Bank, including SBA-guaranteed loans, even where the loan was made without the use of any outside broker. On these occasions, when Noah Bank had made a small business loan but no broker had been used, Shin arranged to have Kim inserted into the transaction to make it appear as if the loan had been made through a broker in order to generate a broker's fee that could be shared with Shin. In fact, however, Kim did no actual work on these loans to earn a commission and the insertion of Kim into the transaction was simply a mechanism to siphon off money to Shin in connection with an SBA loan. In exchange for doing this, Kim was also permitted by Shin to keep a small percentage of the "broker's fee." In total, we believe that Shin was provided with at least approximately $100,000 to $120,000 worth of bribe or kickback money.

      In addition, Kim participated in obtaining Noah Bank SBA loans for entities partially owned by Kim in which Shin had secret, undisclosed interests. For example, Kim brokered a loan on behalf of a deli called 1797 Empire in New York, New York. 1797 Empire was thirty-percent owned by Shin's wife, Sophie Hahn. In fact, records from 1797 Empire's bank account show that over $150,000 worth of checks were made out to Hahn. This fact should have prevented Noah Bank from ever issuing an SBA loan to 1797 Empire.

    c. <u>Guilty Plea</u>

On May 28, 2019, Kim pled guilty to a three-count Information before the Honorable Alison J. Nathan.  Count One charged Kim with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.  Counts Two and Three charged Kim with conspiracy to commit bank bribery and substantive bank bribery, in violation of Title 18, United States Code, Section 371, and Sections 215(a)(1), and (2), respectively.  This matter has been transferred from Judge Nathan to Your Honor for sentencing.

    d.  <u>Guidelines Calculation</u>

Pursuant to calculation reflected the PSR (¶¶ 27-39, 42), with which the Government agrees, Kim's sentencing Guidelines range is calculated as follows:

A. Offense Level

1. The 2021 version of the Guidelines applies.

2. Counts 1, 2, and 3 are grouped for Guidelines purposes because they involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan, pursuant to § 3D1.2(b); and because the offense level is determined largely on the basis of the total amount of harm or loss, pursuant to § 3D1.2(d).

3. As U.S.S.G. § 2B1.1 produces the higher offense level, it has been utilized for Guidelines calculation purposes, pursuant to U.S.S.G. § 3D1.3(a) and (b).

4. U.S.S.G. § 2B1.1 applies to the offenses charged in Count One ("Group One"). Pursuant to U.S.S.G. § 2B1.1(a)(1), because the offenses of conviction have a statutory maximum term of imprisonment of 20 years or more, the base offense level is 7.

5. Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), because the loss amount exceeded $3,500,000 but was less than $9,500,000, the base offense level is increased by 18 levels.[1]

6. In accordance with the above, the offense level for Count One is 25.

*Acceptance of Responsibility*

---

[1] We recognize that in sentencing Kim's co-conspirator, Edward Shin, the Court determined that the appropriate loss amount is between $250,000 and $550,000, resulting in a 12-level increase. The Court explained that it did not find any actual loss based on the amount of the loans that defaulted in connection with the criminal scheme, but that it did find loss as a result of Noah Bank's payment of fraudulent commissions.  (Oct. 10, 2022 Shin Sent. Tr. at 44-45). While the Government maintains that the loss calculated by the Probation Department in this case is correct, we of course recognize and respect the Court's analysis, and emphasize that Kim was far less culpable than Shin in the charged schemes.

7. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

8. In accordance with the above, the total offense level is 22.

B. Criminal History Category

Kim has no criminal history points and is in Criminal History Category I. Accordingly, his Guideline range is 41 to 51 months' imprisonment.

II.     Kim's Cooperation

Kim began proffering with the Government in 2017. Significantly, Kim began cooperating *before* being criminally charged. As Kim explained at trial, upon receiving a business card left by a law enforcement agent who was attempting to contact him, Kim sought counsel and immediately decided to cooperate and take responsibility for his conduct. From the outset Kim was forthcoming and credible about his involvement in the offense and the involvement of others. Although at the time of Kim's initial proffers the Government was in possession of documentary evidence establishing the issuance of fraudulent broker fees by Noah Bank, the Government lacked co-conspirator evidence of Edward Shin's knowledge and involvement in that scheme. Because Kim and Shin were the sole participants in many criminal conversations and transactions, the information furnished by Kim was critical in charging and ultimately convicting Shin. In addition to furnishing critical information during the early days of the Government's investigation in 2017, Kim also provided the Government with documents it otherwise did not know existed at that time; those documents furnished the Government with significant investigative leads for new subpoenas for evidence that incriminated Shin and corroborated Kim. Those documents were likewise important in the Government's ability to convict Shin.

Over the course of years, including through the COVID-19 pandemic, Kim made himself available for dozens of proffer and trial preparation sessions with the Government. His commitment to the cooperation process despite his age, the difficulty of working through voluminous documents using an interpreter, and numerous delays caused by the pandemic speaks volumes about how seriously Kim has treated his cooperation obligations. Kim did everything the Government requested in full satisfaction of his cooperation agreement, without hesitation or complaint. Kim treated the process with the utmost seriousness and respect.

Kim testified over the course of five days at Shin's May 2022 trial and was subjected to extensive cross-examination. His testimony, which the jury necessarily credited in convicting Shin, constituted key evidence at trial. Indeed, Kim's testimony was largely at odds with Shin's

testimony, and provided the necessary context against which the jury could assess the other evidence and reach a determination of guilt. As an insider and co-conspirator, Kim was able to walk the jury through his dealings with Shin, and was corroborated in significant respects by the testimony of borrowers, Marie Lee, Bum Tak Lee, and others. Although the cross-examination of Kim made clear that his memory with respect to certain deals with Shin—some of which dated back to 2010—were "fuzzy"—as Kim fully admitted—Kim offered powerful testimony regarding key components of his fraudulent broker fee and kickback schemes with Shin. For example, Kim testified as to his "clear recollection" of splitting certain kickback payments with Shin, and his "clear recollection of how it was shared . . . sometimes I cut checks to him, sometimes he told me to cut checks to certain number of companies . . . [s]ometimes at the office I gave him cash." (Trial Tr. at 953-54).

With respect to the fraudulent broker payments received by Kim's companies, Kim's testimony corroborated numerous bank borrowers who testified that they did not use a broker in their dealings with Noah Bank. For example, Kim testified clearly—and contrary to Shin's own testimony—that he had never met a Noah Bank borrower named Mustafa Coskun; Coskun separately testified to not knowing Kim, despite Kim's companies receiving tens of thousands of dollars in broker fees in connection with Coskun's Noah Bank loans. (Trial Tr. at 1256 and 1265 (Coskun), 764-65 (Kim), 1834 and 1838-39 (Shin)). Kim's testimony regarding a falsified balance certificate obtained from Noah Bank by Shin was consistent with and corroborated by the testimony of Marie Lee. (Trial Tr. at 929, 933-34 (James Kim) and 348 (Marie Lee)).

Kim offered testimony, unavailable from any other source, that Shin had arranged for Kim's company BADA Realty to receive a kickback check from a construction company in exchange for the company receiving a construction job at Noah Bank; Kim further explained that after receiving this construction company check, Kim cut a blank check to Shin. (Trial Tr. at 801-802). Likewise, Kim offered testimony, unavailable elsewhere, that Shin had told him to conceal from Noah Bank the fact that Shin had a hidden financial interest in certain Noah Bank borrowers—a fact that, had it been known to the bank, would have resulted in the rejection of loans to those borrowers as related party transactions. (*See, e.g.*, Trial Tr. at 1134).

Kim's testimony on the foregoing matters, and the myriad other transactions discussed at trial, were significant components of the Government's case-in-chief, and instrumental in securing a conviction of Shin.

III.   Restitution/Forfeiture

As the Court is aware, Noah Bank has chosen not to seek restitution in this case. Kim has consented to forfeiture in the amount of $3,670,000, which is joint and several with Shin. The Government will submit a consent preliminary order of forfeiture prior to sentencing.

IV.   Conclusion

As described above, Kim's cooperation was critical to the prosecution and ultimate conviction after trial of Edward Shin, a powerful bank CEO. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no

additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to request at sentencing pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:   /s/
   Tara La Morte
   Anden Chow
   Jessica Greenwood
   Assistant United States Attorneys
   212-637-2348/1041/1090